# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

June 29, 2018

Via Email and ECF
The Honorable Sanket J. Bulsara
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     *United States v. Mohamadou Lamine Mbacke,* 18 CR 287

Your Honor:

The Defendant respectfully submits the following Motions:

1) Motion to Renew the Defense Motion for Acquittal under Rule 29(a);

2) Motion for Judgment of Acquittal under Rule 29(c)(2);

3) Motion for a Conditional Ruling for a New Trial with specified reasons under Rule 29(d)(1); and

4) Motion for a New Trial under Rule 33(a).

5) In the alternative, Motion to Dismiss Based on Constitutional As-Applied Vagueness

## BACKGROUND

### I.  Evidence Adduced At Trial and Procedural History

Mr. Mbacke, a citizen of Senegal, who had entered the United States in 2005 on an A-2 Visa, was served with a Notice to Appear on January 13, 2013, seeking his removal from the United States based on certain findings, including his failure to maintain A-2 status.  Gov't Ex. 1. Mr. Mbacke was placed in immigration detention on August 8, 2015, Def. Ex. H, appeared before an Immigration Judge on August 25, 2015, stipulated to his removal, waived his right to appeal, and thereafter was ordered removed.  Gov't Ex. 7.  He was maintained in immigration detention beginning on August 8, 2015, at the Calhoun County Jail in Michigan, which held a contract with Immigration and Customs Enforcement (ICE) for housing immigration detainees.  Tr. 228.  He was denied release on December 12, 2015, Def. Ex. I, and remained detained at the Calhoun

County Jail awaiting deportation on a final order of removal for approximately 10 months, from August 8, 2015 to June 16, 2016. Tr. 398.

On June 15, 2016, Mr. Mbacke was ordered released from immigration custody and placed on ICE supervision. Def. Ex. G. The Release Notification, Def. Ex. G, was duly issued by HQ (Headquarters) Chief Heath Simon, and was accompanied by a checklist to be completed by ICE Headquarters, as in all cases referred to that office. Def. Ex. G4. The HQ Checklist indicates that "Jurisdiction" of the matter was "with HQ RIO," that there were no medical or psychological issues, that it was not a National Security or Special Interest Case, and that the travel document had been requested from Senegal. *Id.* The HQ Checklist contained a notation that "Mbacke was interviewed by Senegal embassy on 3/31/2016," and that "Senegal is uncooperative and will not issue travel documents." *Id.* The HQ Checklist was prepared by a HQ official, David Scarberry, and then reviewed and signed off on the HQ RIO Unit Chief, Heath Simon, on June 15, 2016. Def. Ex. G4. Deportation Officer Labadini certified that he served the Release Notification on Mr. Mbacke on June 16, 2016 at the ICE detention facility, and Mr. Mbacke indicated receipt of same by his signature dated the same day. Def. Ex. G2.

Mr. Mbacke was thereafter released to ICE Supervision without incident. ICE officials advised him that "ICE will continue to make efforts to obtain your travel documentation." Def. Ex G. At trial, the Government offered no evidence (apart from a conclusory statement in Gov't Ex 5) to indicate that Mr. Mbacke had in anyway obstructed this effort or failed to comply with any of the conditions of his release on ICE supervision. He was, however, arrested on a state criminal charge in Wayne County, Michigan, and was taken into state custody in April of 2017 where he was held until his acquittal on January 24, 2018. Tr. 257.

The Government offered no evidence at trial that ICE revoked the June 15, 2016 release order while Mr. Mbacke was in Wayne County custody. To the contrary, no revocation of release was referenced at trial apart from Gov't Ex. 5, which is dated January 26, 2018, following Mr. Mbacke's Wayne County acquittal. The legality of Gov't Ex. 5 was vigorously contested at trial.

On March 26, 2018, an immigration agent picked Mr. Mbacke up from the Wayne County Jail, transported transported him back to the Calhoun County Jail where he was once again purportedly held as an ICE detainee. Tr. 228.

The Government introduced Gov't Ex. 5 as the legal authority for ICE taking custody of Mr. Mbacke on January 16, 2018, following the acquittal on the state charges. That exhibit is entitled Notice of Revocation of Release and is purportedly signed by R. Adducci, Field Office Director, using the initials "MSM," on "1-26-2018". The second page of the exhibit contains a "Proof of Service" certification by Deportation Officer Marcel S. Mikulec. Unlike the June 2016 Release Notification document, Def. Ex. G, the Notice of Revocation document is not signed by Mr. Mbacke, and the Government chose not to call Deportation Officer Mikulec to testify as to what he told Mr. Mbacke regarding his custodial status.

The Government offered no evidence at trial regarding the legal effect of the transfer of jurisdiction over Mr. Mbacke's custody to ICE Headquarters pursuant to the June 2016 Release

Order, per Def. Ex. G, a matter in this record that is further elucidated by Def. Ex. I, an document served on Mr. Mbacke during his first ICE detention (August 2015 to June 2016), and indicating that if Mr. Mbacke was not released or removed by a certain date, "jurisdiction of the custody decision in [his] case will be transferred to the Headquarters Post Order Review Unit (HQ POCRU)" in Washington, DC, which would be responsible for making a final "determination regarding [his] custody." *Id.*

The Government offered no evidence at trial to explain the charge in the 2018 Notice of Revocation of Release indicating "Failure to Provide Senegalese Travel Document." The custodian of the A-file records, Government witness ICE Agent Thomas Koval, admitted that he had no information about the basis for that "Failure to Provide" charge, or whether Mr. Mbacke had been afforded the promise that he would be "promptly afforded an informal interview at which you will be given an opportunity to respond to the reasons for the revocation." Gov't Ex. 5; Tr. 424.

Agent Koval testified that on March 27, 2018, he picked Mr. Mbacke up from the the Dearborne Jail, the same facility from which Mr. Mbacke had been previously released in June 2016, and transported him to the Detroit Airport where he removed Mr. Mbacke's handcuffs. Tr. 368. Agent Koval could recall no conversations with Mr. Mbacke during his interactions with him at all, much less any that involved specific notice or explanations regarding the limitations upon Mr. Mbacke's freedom once the handcuffs were removed.[1]

There is only one piece of evidence in this record of what the ICE officials told Mr. Mbacke on March 26 and March 27, 2018, when he was picked up from Calhoun County Jail, moved to the Dearborne Jail, and then driven to the Detroit Airport. That evidence is the circumstantial inference to be drawn from the ICE Computer system, EARM, which described Mr. Mbacke's status on March 27, 2018 as "released." Tr. 418-19.

After walking way from JFK Airport, Mr. Mbacke was arrested on March 30, 2018 in Chicago, Illinois, on March 30, 2018. There he was detained by a Magistrate Judge for the Northern District of Illinois under Rule 5(c)(3) of the Fed. Rules of Crim. Pro. and the Bail Reform Act, and ordered removed to answer to a criminal complaint to the Eastern District of New York. *See* Docket 18-CR-197, N.D. Ill. While he was at the MCC Chicago, two OIG agents interviewed him without notice to assigned counsel. That interview was audio taped and provided to the defense as Bates 298. A CD-Rom of that interview is attached herein. The CD-Rom is respectfully offered in the context of the Court's consideration of the Rule 33 Motion for a New Trial, to amplify the prejudice to the Defendant's strategy by the Court's erroneous rulings.

## II. Legal Texts and Standards

Our motions depend upon the following legal texts and standards:

---

[1] By contrast, Def. Ex. H, the original Notice of Custody Determination served on Mr. Mbacke on August 19, 2015, serves notice that he was being detained by ICE, including and indicated the legal basis, Section 236 of the Immigration and Nationality Act and part 236 of Title 8, Code of Federal Regulations. Def. Ex. H was acknowledged received by Mr. Mbacke on the form itself with both Mr. Mbacke's signature and his fingerprint.

**Rule 29. Motion for a Judgment of Acquittal** (pertinent portions italicized)

a) *Before Submission to the Jury.* After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion *must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction.* If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

(b) Reserving Decision. The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide such a motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

(c) *After Jury Verdict or Discharge.*

> (1) Time for a Motion. A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.
> (2) Ruling on the Motion. *If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal.* If the jury has failed to return a verdict, the court may enter a judgment of acquittal....

*          *          *

(d) Conditional Ruling on a Motion for a New Trial.
> (1) Motion for a New Trial. *If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.* The court must specify the reasons for that determination.

For purposes of Rule 29, the Court must consider the evidence in the light most favorable to the Government and draw inferences in the Government's favor. *See United States v. Parkes*, 497 F.3d 220, 225 (2d Cir.2007).

**Rule 33. New Trial (pertinent portions italicized)**

(a) Defendant's Motion. Upon the defendant's motion, the *court may vacate any judgment and grant a new trial if the interest of justice so requires.* If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

For purposes of Rule 33, this Court is given great deference on appellate review *See United States v. Scotti*, 47 F.3d 1237, 1241 (2d Cir.1995) (appellate review standard is abuse of discretion). For its part, Rule 33 is less about proof, more about correcting injustice. *Id.*, 246 F.3d 129, 133 (C.A.2 (N.Y.), 2001).

**Crime Charged/18 USC 751(a)**, with subsections chosen by the Government in its Information, ECF Dkt. 09:

> Whoever escapes . . . from the . . . custody of an officer or employee of the United States pursuant to lawful arrest, shall, if the custody or confinement is by virtue of . . . or for exclusion or expulsion proceedings under the immigration laws.

## III. Defendant's Averments:

**A) No Factual Custody - Scope of Custody.** The Government's proof on factual custody was insufficient to sustain a conviction in that the parameters of the alleged custody and scope of permission to leave were insufficiently defined for purposes of criminal liability under 18 USC 751(a).

**B) No Factual Custody – Exclusion or Expulsion.** The Government's proof of "custody or confinement by virtue of . . . or for exclusion or expulsion proceedings under the immigration laws," proved the opposite point – that the proceedings against the Defendant were not for exclusion or expulsion.

**C) No Legal Custody.** The Government's proof of legal custody was insufficient to sustain a conviction in that it failed to show that there was a "lawful arrest" as a source of authority for the custodial setting on March 27, 2018.

**D) New Trial in Interests of Justice.** If the Court does not agree on the Judgment of Acquittal under Rule 29, the Court should vacate the verdict and grant a New Trial in the interests of justice given the confluence of the Court erroneous instruction to the jury on "expulsion," which charged the defense out of the case, along with the erroneous ruling regarding the existence of an OIG investigation into the conduct of the officers.

**E) Motion to Dismiss Information – As-Applied Vagueness Challenge –** Should the Court disagree with the Defendant's Motion for Judgment of Acquittal, it is respectfully requested to consider a Motion to Dismiss the Information on Constitutional grounds.

## IV. ARGUMENT

### A. Factual Custody – Boundaries of Custody and Scope of Permission

The Government's proof on factual custody was insufficient to sustain a conviction because the boundaries of the Defendant's alleged custody and scope of permission to leave were insufficiently defined for purposes of criminal liability under 18 USC 751(a).

The Court is aware that L. Sand et al., Modern Federal Jury Instructions (Nov. 1996), states that courts are in agreement that the custody element of the crime of escape (18 U.S.C. 751(a)) has two parts: factual custody and legal custody. Sand, Instr. 28-3 (*citing United States v.*

*Rodriguez-Fernandez*, 234 F.3d 498, 500-501 (11th Cir. 2000 (reversing conviction); *United States v. Edrington*, 726 F.2d 1029 (5th Cir. 1984); *United States v. Richardson*, 687 F.2d 952 (7th Cir. 1982 ); Strickland v. United States, 339 F.2d 866, 868 (10th Cir. 1965); *Mullican v. United States*, 252 F.2d 398, 403 (5th Cir. 1958).

There is a split in the circuits regarding at what point factual custody embraces scenarios outside the core conduct of a classic jailhouse break. *Cf. United States v. Edelman*, 726 F.3d 305 (2d Cir. 2013) (halfway house as condition of supervised release considered custody); United *States v. Rudinsky*, 439 F.2d 1074 (6th Cir. 1971) (community treatment center considered custody); *United States v. Sack*, 379 F.3d 1177 (10th Cir. 2004) ( halfway house as condition of pretrial release considered custody); *with United States v. Baxley*, 982 F.2d 1265 (9th Cir. 1992) (halfway house as condition of pretrial release not considered custody); *United States v. Burke*, 694 F.3d 1062 (9th Cir. 2012) (halfway house as condition of supervised release not considered custody); *United States v. Fico*, 16 F.Supp.2d 252 (WDNY 1998) (same).

The Second Circuit has fixed as the standard that "a person may be in custody even absent physical restraints or constant supervision, so long as there is some restraint upon his complete freedom." *United States v. Edelman*, 726 F.3d 305, 309-10 (2d Cir. 2013). Even under the broadest reading of the term "custody," however, there is a common theme in the cases requiring that the person in custody receive fair notice defining the parameters of the custody. For example, in *Edelman*, there was no dispute that a sentencing judge had ordered the defendant confined to a halfway house as a condition of his supervised release. That order of confinement had defined boundaries:

> Edelman signed a waiver agreeing to a modification of the terms of his supervised release, which provided that Edelman would reside in a residential reentry facility for a period of five months," after which Edelman began his placement in a Residential Reentry Center designated by the Department of Justice as a residential reentry facility or halfway house. . . [where he] received an "Orientation Checklist" that set forth the facility's rules. . ."

726 F.3d at 307. The Checklist stated,"inter alia, that residents could not leave without notifying staff; could only leave the building for up to 12 hours at a time; and could not combine work, leisure, or other activities, but instead had to return to the facility and sign out separately before each activity. It also provided that '[r]esidents are subject to search of their persons and property by staff at any time.' 76 F.2d at 308. When one day Edelman walked away and never returned he was charged with escape.

The written boundaries in *Edelman* stand in stark contrast to the absence of such boundaries when ICE Agent Koval picked Mr. Mbacke up from the Dearborne Jail on March 27, 2018. To the contrary, the "Notice of Revocation of Release," G. Ex. 5, reads as just that – a notice of process that was to be forthcoming, warning of criminal liability for interference with his removal under 8 U.S.C. Section 1253(a). It was neither signed nor acknowledged by Mr. Mbacke, unlike other orders in this record, such as the original 2015 detention order, Def. Ex. H, and the Release Notification, Def. Ex. G. Given the lack of documentary notice, it was incumbent upon the

Government to offer testimony to establish that Mr. Mbacke was given *Edelman*-type notice of the parameters of his custody. No such testimony was offered. While his custodial status might have been obvious to Mr. Mbacke when he was at the Calhoun County Jail from January 26 to March 26, 2018, once he was transferred without notice to the Dearborne Jail on March 26 and picked up the next day by Agent Koval, the physical limitations wildly changed without explanation. Yet Agent Koval could remember nothing of his conversations with Mr. Mbacke on March 27.

Applying the Rule 29 standards, this is not a situation in which the Court is being asked to become a "13th Juror" to evaluate the credibility of the custodial agents. There is no testimony to evaluate. The obvious witness to offer that testimony would have been Agent Koval, or at least the agents who picked Mr. Mbacke up to transfer him from Calhoun County Jail to the Dearborne Jail. The Government chose not to fill that gap.

There being no testimony or evidence in this record of any notice to Mr. Mbacke similar to the district judge's placement order and the "Orientation Checklist" described in *Edelman*, Mr. Mbacke's cases can be easily distinguished from *Edelman*. As such, no rational juror could have found that Mr. Mbacke was provided fair notice of the limitations of his freedom, and the Judgment of Acquittal must therefore be granted.

On this factual custody point, it bears mentioning the critical distinction between criminal, such as existed in *Edelman,* and the civil custody in Mr. Mbacke's case. In the criminal custody context of 18 U.S.C. 751(a) the roles of defendants, judges, and custodians are predicable and traceable to written laws. The Second Circuit explicitly relied on the *Edelman* court's decision that the custodial authority was sourced in the *original judgment of imprisonment itself* by the district judge and duly extended by virtue of the sentencing judge's order *revoking* that supervised release. 726 F.3d at 309; *see also United States v. Stiles*, 965 F.2d 353, 354 (7th Cir. 1992) ("The government presented evidence which suggest that Stiles' confinement was by virtue" of his original conviction.").

Here, factual custody in this particular immigration context was left to the whims of the immigration agents. By contrast, in the criminal custody context, if a defendant is sentenced to a prison or a halfway house, those facilities ultimately answer to the Attorney General and the Judge in defining the boundaries of custody.[2] Indeed, in the sentencing laws authorizing custody upon which *Edelman* ultimately rests, Congress has spoken about the very problem that led to this trial–the nature of an inmate's custody when they are outside the traditional, secure jail facility. Congress has plainly spoken in 18 U.S.C. 3621, explicitly defining these outer limits of custody:

18 USC 3621. Imprisonment of a convicted person.

(b) Place of Imprisonment.—The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or

_____

[2] See, e.g. 18 USC 3586 (implementation of sentence of imprisonment governed by 18 USC 3621).

correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering (1) the resources of the facility contemplated; (2) the nature and circumstances of the offense;(3) the history and characteristics of the prisoner; (4) any statement by the court that imposed the sentence— (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or (B) recommending a type of penal or correctional facility as appropriate; and (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.the place any available penal or correctional facility . . .

\*            \*            \*

(c) Delivery of Order of Commitment.—
When a prisoner, pursuant to a court order, is placed in the custody of a person in charge of a penal or correctional facility, a copy of the order shall be delivered to such person as evidence of this authority to hold the prisoner, and the original order, with the return endorsed thereon, shall be returned to the court that issued it.

(d) Delivery of Prisoner for Court Appearances.— The United States marshal shall, without charge, bring a prisoner into court or return him to a prison facility on order of a court of the United States or on written request of an attorney for the Government.

Thus, at every step of the process, 18 U.S.C. 3621 puts a prisoner on notice of his custodial status once a judge orders him into the Attorney General's custody. The facilities are subjected to defined standards. 18 U.S.C. 3621(b). Delivery to and from facilities is defined, and importantly, noticed to the very court that issued the original custodial order. 18 U.S.C. 3621(c). Even a prisoner's appearances in court are subject to defined standards. 18 U.S.C. 3621(d).

This is the system of custody that underlies the *Edelman* decision, once again a far cry from the system of custody to which Mr. Mbacke was subjected as a civil detainee.

The problem presented by Mr. Mbacke's case might be seen as predicted by the Supreme Court *United States v. Bailey*, 444. U.S. 394 (1980), a traditional jailbreak case. There, the Supreme Court left open the possibility that some escapes are less clear than others:

As for the element of "escape," we need not decide whether a person could be convicted on evidence of recklessness or negligence with respect to the limits on his freedom. A court may someday confront a case where an escapee did not know, but should have known, that he was

8

exceeding the bounds of his confinement or that he was leaving without permission.

*United States v. Bailey*, 444 U.S. 394, 407-08 (1980) (citations omitted).

Inherent in the criminal custody context are procedural protections to ensure fair notice, accountability and checks and balances. While there are other non-traditional escape-from custody-cases upheld by courts, to be sure, Mr. Mbacke's case is different precisely because it arises in a system lacking in these traditional protections. Thus, it cannot be said based on the record before this Court at the Rule 29 hearing that, as stated in the characteristic case *United States v. Foster*, 754 F.3d 1186, 1193 (10th Cir. 2014):

> [The Defendant] was ordered by the district court to reside at the reentry center as a condition of supervised release. [The Defendant] knew where he was to reside, and for what period, and that he was not allowed to leave without prior approval. Under these facts, [the Defendant] had fair notice his absconding from the reentry center would constitute escape under § 751(a).

754 F.3d at 1193.

Mr. Mbacke had no such notice defining the parameters of his factual custody. Rule 29(a) therefore directs that the Court "must enter a judgment of acquittal" based on the insufficiency of the Government's case. We respectfully renew our motion to acquit made at the close of the Government's case, and additionally move pursuant to Rule 29(b) following the Court's reservation.

## B.  No Custody – The Exclusion/Expulsion Language

The Government charged Mr. Mbacke by way of a Misdemeanor Information filed pursuant to Rule 7(a)(2) and Rule 58(b)(1) of the Fed. R. Crim. Pro.  In drafting the Information (ECF Dkt. # 9), the Government chose to specify, as required under Rule 7(c)(1), the means by which the Defendant was alleged to have committed the crime, i.e. "knowingly and intentionally escap[ing] from the custody of an officer and employee of the United States, to wit: Deportation Officers of United States Immigration and Customs Enforcement, pursuant to exclusion and expulsion proceedings under the immigration laws."

The evidence adduced at trial does not permit a rational juror to conclude that Mr. Mbacke was in custody for "exclusion or expulsion proceedings under the immigration laws."

The section the U.S. Attorney chose to specify under Rule 7(c)(1) authorized punishment upon conviction as a misdemeanor offense where the "custody or confinement is by virtue of . . . exclusion or expulsion proceedings under the immigration laws." 18 U.S.C. 751(a).  The Information alleges no other means of violating 18 U.S.C. 751(a), and a variance in the proof at trial by seeking a conviction on the alternative means of violating 18 U.S.C. 751(a) would violate Rule 7(e).

"Exclusion" and "expulsion" are legal terms which § 751(a) manifestly employs by modifying them with the phrase "under the immigration laws." This phrase would be not just meaningless but actively *misleading* if, as the Government contends, Congress meant to refer to a lay or dictionary understanding of "exclusion or expulsion." The definitional directive toward the law rather than the dictionary is clear from the plain text of the statute. Even if there were ambiguity in the text, the Court would look simply to the canon of statutory construction that when Congress uses identical language from a related statute it is presumed to intend the repeated language be interpreted to mean the same thing. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 695-96 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law.") .

The phrase "exclusion or expulsion proceedings" is specifically defined in the current law, 8 C.F.R. 241.33, which is under the heading 8 CFR, Subpart C, and refers specifically to proceedings commenced prior to 1997.

Subpart C—Deportation of Aliens in the United States (for Hearings Commenced Prior to April 1, 1997)

↑ Back to Top

§241.30   Proceedings commenced prior to April 1, 1997.

Subpart C of 8 CFR part 241 applies to deportation proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

\*      \*      \*

§241.33   Expulsion.

(a) *Execution of order.* Except in the exercise of discretion by the district director, and for such reasons as are set forth in §212.5(b) of this chapter, once an order of deportation becomes final, an alien shall be taken into custody and the order shall be executed. An order of deportation becomes final in accordance with 8 CFR 1241.31.

(b) *Service of decision.* In the case of an order entered by any of the authorities enumerated above, the order shall be executed no sooner than 72 hours after service of the decision, regardless of whether the alien is in Service custody, provided that such period may be waived on the knowing and voluntary request of the alien. Nothing in this paragraph shall be construed, however, to preclude assumption of custody by the Service at the time of issuance of the final order.

[62 FR 10378, Mar. 6, 1997, as amended at 65 FR 82256, Dec. 28, 2000; 70 FR 674, Jan. 5, 2005]

8 CFR Subpart C.

As the Court is aware, Congress comprehensively overhauled the immigration laws in the 1996 Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), with most of those changes becoming effective April 1, 1997.[3] Decades of subsequent litigation have made painfully clear that the pre-1997 immigration law and post-1997 immigration law are entirely different animals, carrying with them distinct processes, procedures, and bases for relief, among other things, for ordering and carrying out a deportation (in the colloquial sense). *See generally Vartelas v. Holder*, 566 U.S. 257, 261 (2012) ("Before IIRIRA's passage, United States immigration law established two types of proceedings in which aliens can be denied the hospitality of the United States: deportation hearings and exclusion hearings. Exclusion hearings were held for certain aliens seeking entry to the United States, and deportation hearings were held for certain aliens who had already entered this country."). The 1996 revisions replaced these with a single, uniform process of "removal" proceedings under the new Section 240 of the Immigration and Nationality Act (codified at 8 U.S.C. § 1229a (1994 Supp.V)); *see Twum v. I.N.S.*, 411 F.3d 54, 57 & n.1 (2d Cir. 2005).[4]

---

[3] Pub.L. No. 104–208, Tit. III, div. C, 110 Stat. 3009 (codified at scattered sections of 8 U.S.C. (1994 Supp. V)).

[4] *See also* IIRIRA §§ 303, 304, 110 Stat. 3009-585, 587 (eff. April 1, 1997).

Proceedings initiated after April 1, 1997 result in an order of "removal" if the non-citizen is granted no relief. 8 U.S.C. § 1229a(c)(5). The modern statute and its implementing regulations set out detailed procedures for carrying out removal orders, including detailed provisions for arrest and custody for that purpose.[5] *See Zadvydas v. Davis*, 533 U.S. 678, 697-98 (2001) (explaining how IIRIRA rescinded and replaced prior provisions governing detention and physical removal from the country). In particular, designated officials issue a "warrant of removal" against a non-citizen with a final order of "removal," and other designated officials are empowered to execute the warrant and take the non-citizen into custody. 8 C.F.R. § 241.2(a)(1); 241.2(b). Other provisions in Subpart A of Part 241 of the immigration regulations at 8 C.F.R., discussed in more detail *infra*, govern detention pending final removal.

The terms "exclusion" and "expulsion" employed in 18 U.S.C. § 751(a) and the Information are best understood as having specialized, legacy meanings under the immigration law as pre-1997 legal concepts. 18 U.S.C. Section 751(a), on the other hand, was enacted in something like its present form was in 1948, referring to extradition but not specifically to civil immigration proceedings,[6] four years before the 1952 McCarran-Walter Act (hereinafter "the 1952 Act"). The "exclusion or expulsion" proceeding language was added to 18 U.S.C. Section 751(a) in 1988, apparently to make clear that escape from civil custody (as immigration is) deserved misdemeanor treatment (whereas prior to the amendment it might have been treated under the general "custody of the Attorney General" provision, a felony, not charged in the Information in *this* case). Pub. L. No. 100-=690, tit. VII § 7055, 102 Stat. 4402 (Nov. 18, 1988).

Congress's decision to amend Section 751(a)'s penalty provision notwithstanding, the 1952 McCarran-Walter Act forms the backdrop for an understanding of the terms "exclusion or expulsion" in the history of immigration law. Prior to the 1952 Act there were scattered session laws, and the organizing principle of the law ultimately resulted in the enactment of a single set of laws – the Immigration and Nationality Act (hereinafter "the INA") referred to in cases like *Vartelas* and *Centurion*.[7] So far as undersigned counsel can determine,[8] Congress had first used the terms "exclusion"[9] and "expulsion" in the title of the Act of October 16, 1918, Pub. L. No. 65-221, 40 Stat. 1012 ("An Act to Exclude and Expel from the United States Aliens who are Members of the Anarchist and Similar Classes") (hereinafter "1918 Act").[10] Section 1 the th111at 1918 Act

---

[5] *See generally* 8 U.S.C. §§ 1229a ("Removal Proceedings"); 1231 ("Detention and Removal of Aliens Ordered Removed"); *see also* 8 C.F.R. Part 241 Subpart A (titled "Post-hearing Detention and Removal"). This provisions are discussed in detail *infra*.

[6] Act of June 25, 1948, ch. 645, 62 Stat. 734.

[7] Pub. L. No. 87-414, 66 Stat. 166 (1952).

[8] Very old volumes of the Statutes at Large are text-searchable only in PDF fomat, so far as counsel is aware. Searches for the terms "expel" or "expulsion" yielded different results in PDF's made available on Westlaw and by the Library of Congress, suggesting the software is not fully reliable. See Library of Congress, Statutes at Large, at https://www.loc.gov/law/help/statutes-at-large/index.php.

[9] As the Court instructed the jury, the term "exclusion" is not at issue in this case (there being no dispute that the term refers to noncitizens denied entry *ab initio*). Gov't Ex. 1 (Notice to Appear); Gov't Ex. 16 (not checking box for exclusion prior to 1997). However, some discussion of the term "exclusion" is useful in discussing the origin of both terms "exclusion" and "expulsion."

[10] Formerly codified at 8 U.S.C. § 137 (repealed, Act of June 27, 1952, c. 477, Title IV, § 403(a)(13), (16), (48), 66 Stat. 279, 280, (eff. Dec. 24, 1952)).

provided that specified undesirables "shall be excluded," while Section 2 provided that "any alien who, at any time after entering the United States, is found to have been at the time of entry, or to have become thereafter, a member of any one of the classes of aliens enumerated in section one of this Act, shall, upon the warrant of the Secretary of Labor, be taken into custody and deported." *Id.*, 40 Stat. at 1012. Section 2 of the 1918 Act did not employ the term "expel" in the body of the text, but term "expel" is in the caption, encapsulating the body of the law describing the the process under Section 2 for ejecting non-citizens who have already entered (as opposed to those applying for entry under Section 1). The Section 1 process is referred to only as "exclu[sion]" within that section; while Section 2 referred to noncitizens who had already entered and were subject to expulsion because they were deemed unwelcome by virtue of their membership in the "anarchist and similar class[es]."[11]

The Supreme Court in *Zadvydas v. Davis*, 533 U.S. 678, 697-98 (2001) explained how IIRIRA rescinded and replaced these prior provisions governing detention and physical removal from the country. Modern regulations governing these procedures for carrying out the 1950's era immigration law edicts make it clear that these concept are extinct post-IIRIRA, relegated to the legacy provisions located in Subpart B of 8 C.F.R. Part 241. The caption of Subpart B of Part 241, which reads "Deportation of Excluded Aliens (for Hearings Commenced Prior to April 1, 1997)," as shown above, is further announced in the text of 8 C.F.R. § 241.20, stating: "Subpart B of 8 CFR part 241 applies to exclusion proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997."

The legal history of the terms "exclusion and expulsion" prior to 1952 (and even well prior to 1918), demonstrates an important point that these legacy terms of art had separate and distinct meanings, as many immigration law terms do.[12] The terms "expel" or "expulsion" appeared in various other enactments after 1918 and before the wholesale revision of the McCarran Walter Act. For example, an Act of May 10, 1920, ch. 174, § 2, Pub. L. No. 66-197, 41 Stat. 593, 594, provided that specified non-citizens convicted of a specified offense during the First World War were subject to being ordered "expelled or excluded," like anarchists; and further provided that "[a]ll persons who shall be expelled under any provisions of this section shall be excluded from readmission into the United States." *Id.* An Act of May 19, 1921, "To limit the Immigration of aliens into the United States," included a definitions provision that defined the term "Immigration

---

[11] Section 3, the third and final section of the 1918 Act, created a felony that resembles modern 8 U.S.C. § 1326 for illegal re-entry of specified noncitizens. Its relevance to another point is discussed *infra*, but it neither uses the term "expel" nor in any way undermines this understanding of the Act's caption.

[12] Of course the Government made no effort at trial to prove that the term "exclusion" applied to Mr. Mbacke. The evidence showed that Mr. Mbacke had been admitted in 2005, Gov't Ex. 1, but that is only one part of the argument. Like "expulsion," the term "exclusion" has only legacy meaning, *see Vartelas*, 566 U.S. at 261 ("exclusion" refers specifically to denial of entry prior to IIRIRA); *see also Centurion v. Sessions*, 860 F.3d 69, 72 (2d Cir. 2017) ("exclusion proceedings" refers to a specific pre-IIRIRA procedure for proceedings against an alien who was seeking entry into the United States). Indeed, Gov't Ex.1, the "Notice to Appear" is a document issued only in post-IIRIRA removal proceedings. Pre-IIRIRA deportation or exclusion proceedings commenced with a different document, an Order to Show Cause. *See Tablic v. Gonzales*, 471 F.3d 60, 63 (2d Cir. 2006) ("'[N]otices to appear' did not exist before the enactment of IIRIRA . . . . '[O]rders to show cause' [were] . . . the initiating instruments for . . . proceedings before the enactment of IIRIRA."). The resulting order of the immigration judge, Gov't Ex. 2, ordered Mr. Mbacke "removed" and therefore can only have been the product of a post-IIRIRA proceeding, as explained above.

Act" to mean "the Act of February 5, 1917, 'An Act to regulate the immigration of aliens to, and the residence of aliens in, the United States"'; and the term "immigration laws" includes such Act and all laws, conventions, and treaties meaning. of the United States relating to the immigration, exclusion, or expulsion of aliens." *Id.* ch. 8., Pub. L. No. 67-5, unnumbered preface, 42 Stat. 5, 5. *See also* Act of May 26, 1924, ch. 190 § 28(g), Pub. L. No. 68-130, 43 Stat. 153, 168 (same).

By 1953, the Supreme Court and other courts had used the term "expel" to refer to the ejection of non-citizens who were not "excluded" at the border. *See, e.g., Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210, 212 (1953) ("Courts have long recognized the power to expel *or* exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments . . . . It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law. . . . But an alien on the threshold of initial entry stands on a different footing." (emphasis added); *Lopez v. Howe*, 259 F. 401, 403 (2d Cir. 1919) ("The right of Congress to exclude *or to expel* aliens, or any class of aliens, absolutely or upon conditions, in war or in peace has been declared by the Supreme Court an inherent and an inalienable right of every sovereign and independent nation." (emphasis added)).

Congress spoke to this in each round of its overhaul of the immigration laws. As noted above, in 1952 Congress had assimilated and expanded prior, more ad-hoc immigration-related session laws in the McCarran-Walter Act. The 1952 Act amended the 1921 and 1924 definitions of "immigration laws" for purposes of the new Immigration and Nationality Act to mean "this Act and all laws, conventions, and treaties of the United States relating to the immigration, exclusion, *deportation or* expulsion of aliens." *Id.* Tit. 1 § 101(a)(17), 66 Stat. at 169 (emphasis added to indicate the amendment to prior law). The 1952 Act appears to be marshaling *all* the various terms that had formed the previous patchwork quilt of immigration law without definitively clarifying whether, for example, "expulsion" and "deportation" had different applications. *Compare* 1918 Act § 2, 40 Stat. 1008 (captioned "Act to Expel and Exclude" but providing in the body of the law for "deportation") *with* Act of May 19, 1921, 67 Stat. 5 (defining "immigration laws of the United States" as "all laws, conventions, and treaties of the United States relating to the immigration, exclusion, or expulsion of aliens" without reference to deportation); *see also Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893) ("The right of a nation to expel or deport foreigners who have not been naturalized, or taken any steps towards becoming citizens of the country, rests upon the same grounds, and is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country.")

Confusion over the precise contours of the legacy terms, however, was put to rest when in 1996 Congress overhauled the INA in IIRIRA. There, Congress amended that definition of immigration law in Sec. 1101 that it had previously amended in 1952 to now read "this Act and all laws, conventions, and treaties of the United States relating to the immigration, exclusion, deportation, expulsion, *or removal* of aliens." *See* IIRIRA 308(d)(4)(A), 110 Stat. 3009 (providing that "Section 1101(a)(17) (8 U.S.C. 1101(a)(17)) is amended by striking "or expulsion" and inserting "expulsion, or removal" (emphasis added). By adding the new term "removal," as separate from the legacy terms exclusion, deportation, and expulsion, IIRIRA relegated those earlier, legacy terms to the history books. Any other construction would render the amendment adding "or removal" to IIRIRA § 308(d)(4)(A), 110 Stat. 3009, a total superfluity. "[T]he canon

against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.,* 568 U.S. 371, 386 (2013) (citing *United States v. Jicarilla Apache Nation,* 564 U.S. 162, 185 (2011); *United States v. Aleynikov,* 676 F.3d 71, 81 (2d Cir.2012) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").

8 C.F.R. 241.33 offers the final epitaph for the superannuated term "expulsion." "Expulsion" is the caption of the regulation at 8 C.F.R. § 241.33, which governs the execution of "an order of deportation," *id.* § 241.33(a) ("[O]nce an order of deportation becomes final, an alien shall be taken into custody and the order shall be executed" except as specified). Section 241.33 is part of Subpart C of Part 241, which is titled "Deportation of Aliens in the United States (for Hearings Commenced Prior to April 1, 1997)." These regulations, including the "Expulsion" regulation at § 241.33, apply *only* to orders resulting from such proceedings. 8 C.F.R. § 241.30. Consistent with all the authority discussed above, including the Act of 1918 that used "expel" in the caption to refer to deportation of undesirables, this regulation cabins "expulsion" to its pre-IIRIRA context. The reference in 18 U.S.C. § 751(a) and the Information to "expulsion under the immigration laws" thus denotes the carrying out of a specific type of legacy order that does *not* encompass a removal proceeding instituted after April 1, 1997,[1] and will one day cease to apply to any cases at all.

As a final consideration on these points, the statutory framework must be read in this criminal case consistent with the rule of lenity to the extent it is ambiguous. *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *United States v. Simpson,* 319 F.3d 81, 86 (2d Cir. 2002) With that in mind, reading "expulsion" to be what we used think of as "deportation," ignores the nuances of history to the detriment of this 2018 criminal defendant.

It is also fair to consider, in deciding the import of these laws, that when Congress saw fit to replace the legacy terms with one concept--removal--after IRIRRA, it self-evidently did not choose to amend 18 U.S.C. § 751(a) to reflect that change in immigration law. This should not be deemed an oversight, as IIRIRA accounted for that omission by *creating separate criminal penalties* specific to efforts to avoid "removal" under the new law. IIRIRA § 307(a), 110 Stat. 3009-612. (codified at 8 U.S.C. § 1253(a)(1), captioned "Penalties related to removal"). Section 751(a) may continue to apply to persons who escape from lawful custody pursuant to an order of exclusion or expulsion prior to April 1, 1997, and certainly to "anarchists and similar class," but after that date 8 U.S.C. § 1253(a)(1) is the sole criminal law that addresses resistance to removal.[2]

---

[1] Subparts B and C of Part 241 are thus legacy regulations preserved to give guidance in cases which commenced prior to April 1, 1997 but which did not *conclude* before the new law took effect. Even today, it is not uncommon to find cases begun under the old legal regime that still present issues for adjudication and require DHS to follow the former procedures when the case ultimately reaches an end. *See, e.g.*, *In re: Eliasar Lopez-Ayala*, No. A070-885-119, 2018 WL 1897685 (B.I.A. Feb. 26, 2018) (dismissing appeal of motion to reopen a deportation proceeding begun prior to April of 1997).

[2] As noted *supra* n.4, legacy exclusion and deportation proceedings still exist ,so–to the extent such a concern could ever trump the statute's plain terms, which it cannot--section 751(a)'s "exclusion or expulsion" prong is not a practical nullity. But again, even if IIRIRA consigned it to *eventual* irrelevance, there is nothing surprising or anomalous about such a result because IIRIRA created other criminal penalties for avoiding removal.

In summary as to this point, since Mr. Mbacke's alleged "custody" was under neither procedures for carrying out an order of "exclusion" pursuant to 8 C.F.R. § 241.25, or "expulsion" based on a deportation order pursuant to 8 C.F.R. § 241.33, no reasonable juror could have concluded that he was in "custody pursuant to exclusion or expulsion proceedings under the immigration laws" as 18 U.S.C. § 751(a) requires and the Information alleges. These were not, and could not have been, the procedures employed against him. For this reason alone, Mr. Mbacke is entitled to a Judgment of Acquittal under FRCP 29.

Because it was raised during the June 21 colloquy on these issues, we wish to address the case of *United States v. Rodriguez-Fernandez*, 234 F.3d 498 (11th Cir. 2000). (Tr. 457:6-16). A careful reading of *Rodriguez-Fernandez* offers no support for the government's position regarding the meaning of "exclusion." It appears that that the defendant in that case was ordered "removed" in November of 1997 under the post-IIRIRA regime.[3] The circuit court referred to the order as one of "exclusion" and the proceeding resulting in that order as an "exclusion proceeding." 234 F.3d at 498, 501. This language choice should not weigh in this Court's decision at all, for at least three reasons.

First, Mr. Rodriguez-Fernandez argued only that his detention was not pursuant to "exclusion proceedings" because the 90-day "removal period," 8 U.S.C. § 1231(a)(1), had elapsed. 234 F.3d at 499, 500-501. (On that issue, *see infra*). He did not argue that his removal order was not one of "exclusion" because that term refers to pre-IIRIRA proceedings. *See id.* The court's use of the terms "excluded" and "exclusion" to refer to the defendant's (apparent) removal proceeding and contemplated removal is therefore purely *obiter dictum*, not a considered holding of a contested issue. Second, even if the court's unconsidered vocabulary choice could be considered a holding—which it cannot—it relates only to "exclusion" and its purported interchangeability with modern "inadmissibility" under INA § 212, 8 U.S.C. § 1182. *See id.* at 498 (reciting that defendant was ordered "excluded" under 8 U.S.C. §§ 1182(a)(2)(B),(C), without citing to historical pre-1997 code).[4] Here, there is no dispute that Mr. Mbacke was charged with grounds of "deportab[ility]" under INA § 237(a)(2), 8 U.S.C. § 1227(a)(2). *Rodriguez-Fernandez* has nothing to offer on whether such a removal proceeding is an "expulsion proceeding[]," 18 U.S.C. § 751(a), the only issue here.[5] Third, again assuming *arguendo* that the court's vocabulary

---

[3] *See* Complaint ¶ 3, *United States v. Rodriguez-Fernandez*, No. 99-cr-00175-UU-1 (M.D. Fla. Mar. 2, 1999) (appended to Indictment, ECF dkt # 16, at 20) (referring to "order of removal" in defendant's A file); *see also Rodriguez-Fernandez*, 234 F.3d at 499 (referring to the "Notice to Appear," an exclusively post-IIRIRA charging document). Neither the actual trial transcript nor the briefs or record on appeal are available on Pacer so far as undersigned counsel can determine.

[4] The grounds of "exclusion" pre-IIRIRA were also codified at 8 U.S.C. 1182 and the two charges in issue were materially identical except that the term "excludable" appears where the modern code says "inadmissible." *See* 8 U.S.C. § 1182(a)(2)(B),(C) (1994 & Supp.). So the circuit court's reference to the exclusion grounds charged is not *self-evidently* a reference to post-IIRRIRA law, but as just noted the complaint in the original action indicates the proceeding was conducted under post-IIRIRA law. Moreover, the court's later discussion of the removal period at § 1231 that his "exclusion" order triggered can only refer to the post-IIRRIRA code ; that section formerly listed "deportation" grounds now found, with major amendments, at § 1227 of 8 U.S.C., *see* 8 U.S.C. § 1227 (1994 & Supp. ).

[5] *See, e.g.*, *Clark v. Martinez*, 543 U.S. 371, 377 (2005) (noting that 8 U.S.C. § 1231(a)(6) provides for post-final-order detention of noncitizens inadmissible under § 1182 and some of those who are deportable under § 1227(a)(2) as distinct categories; considering whether they must be treated the same for due process purposes).

choice were a holding, it is plainly incorrect for all the reasons given above. Indeed the court's imprecision is self-refuting. To the extent the court meant to employ the term "exclusion" to apply to the defendant in a legal sense, that choice led it into patent immigration-law solecisms such as its remark that "[u]nlike the deportation of a previously admitted alien, someone seeking admission but deemed excludable has no constitutional right to due process." 234 F.3d at 501 n.7. As the Court is aware, a noncitizen was subject to *exclusion* only if s/he had not effected an "entry" into the United States, a term of art with a complex history of interpretation under the pre-IIRIRA INA. The concept of "admission" marking a boundary between INA § 212 charges and charges of deportability (under former INA § 241 or modern § 237) did not exist until IIRIRA and is inconsistent with the prior "entry doctrine" because "inadmissibility" applies to successful illegal entrants.[6] It is also (unsurprisingly) absent as a meaningful boundary condition in the due process caselaw the court cited in its garbled recitation.[7] In a legal sense, the category of people "seeking admission but deemed excludable" on that basis (as opposed to deportable), *Rodriguez-Fernandez*, 234 F.3d at 501 n.7, is a null set. The *Rodriguez-Fernandez* court goes down swinging—or better said, commits unforced error—in its conflation of these concepts.

## C. Legal Custody

We next turn to the legal custody arguments, that the Court need only reach if it disagrees that Rule 29 requires a Judgment of Acquittal on the factual custody issues.

### 1. Non-Immigration Related Legal Custody Issues - Authority

In escape cases brought under 18 USC 751(a), courts agree that the custodians must have legal authority for their conduct.[8] *See, e.g., United States v. Rodriguez-Fernandez*, 234 F.3d 498,

---

[6] As the Supreme Court has explained:

> Before IIRIRA's passage . . . [e]xclusion hearings were held for certain aliens seeking entry to the United States, and deportation hearings were held for certain aliens who had already entered this country. . . . Under this regime, "entry" into the United States was defined as "any coming of an alien into the United States, from a foreign port or place." 8 U.S.C. § 1101(a)(13) (1988 ed.). . . . In IIRIRA, Congress abolished the distinction between exclusion and deportation procedures and created a uniform proceeding known as "removal." See 8 U.S.C. §§ 1229, 1229a . . . . Congress made "admission" the key word, and defined admission to mean "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." § 1101(a)(13)(A).

*Vartelas v. Holder*, 566 U.S. 257, 261–62 (2012) (caselaw citations omitted).

[7] *See Mezei*, 345 U.S. at 212 ("[A]n alien on the threshold of initial *entry* stands on a different footing: Whatever the procedure authorized by Congress is, it is due process as far as an alien denied *entry* is concerned." (emphasis added; internal quotation and citation omitted)). *See also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ([Mezei's] presence on Ellis Island did not count as entry into the United States. Hence, he was treated, for constitutional purposes, as if stopped at the border. . . . And that made all the difference." (internal quotations and citations omitted).

[8] Some escape statutes explicitly bar a defendant from attacking the validity of the detention, *see, e.g.* 18 Pa.C.S. § 5121(c) ("[i]rregularity in bringing about or maintaining detention" is not a defense to

501 (11th Cir. 2000) ("[t]here is no authority for the proposition that the experience and judgment of a detention officer alone . . . satisfies the statutory requirements." 234 F.3d 498, 501 (11th Cir. 2000); *United States v. McKim*, 509 F.2d 769, 776 (C.A.Tex. 1975) (reversible error for trial court to forbid inquiry into the lawfulness of the arrest in 18 U.S.C. § 751(a) prosecution where "lawful arrest is an essential element of the offense charged under the statute and the indictment, and must be demonstrated by proof beyond a reasonable doubt."); *United States v. Powell*, 503 F.2d 195, 196, (C.A.D.C. 1974) (no legal custody found in 18 U.S.C. § 751(a) case where defendant "escaped" from custody that had lost its legal vitality when he was acquitted by reason of insanity and awaited further proceedings); *cf. United States v. Argueta–Mejia*, 166 F.Supp.3d 1216, 1223 (D. Colo., 2014) (violation of defendant's Fourth Amendment rights to be free from unlawful seizure where government where police officer lacked legal authority to take illegal alien into custody, and the *Leon* good faith exception was found inapplicable) (citing *Arizona v. United States*, 567 U.S. 387 (2012) .

A particularly instructive case that led to the reversal of an escape conviction is *United States v. Green*, 797 F.2d 855, 858 (10th Cir. 1986), *abrogation recognized on other grounds* 694 F.3d 1141. In *Green,* the defendant was charged with attempting to escape from the custody of his parole officer who had arrested him based on the defendant's state warrant alleging a new crime. At issue was the source of the parole officer's authority, which the court traced to 18 U.S.C. 4213, which states that "if any parolee is alleged to have violated his parole, the Commission may issue a warrant and retake the parolee." *Green*, 797 F.2d at 857. The Tenth Circuit reversed the conviction because the arrest for the parole violation took place *before* the Commission issued such a warrant. *See also United States v. Janvier*, 599 F.3d 264 (2d Cir. 2010) (the district court lacked jurisdiction to entertain a violation of supervised release where the statute required that the violation warrant be not just signed by the district judge, but *filed* with the clerk of the court.)

Further discussion regarding *Janvier* and its application to Mr. Mbacke's case can be found, *supra.*

### 2.  Immigration Related Legal Custody Issues - Authority

#### a.  Arrest "For" Language

18 U.S.C 751(a) requires proof that the escape was from custody obtained by virtue of an "arrest *for*" the aforementioned immigration proceedings. Once again, the Government's proof is insufficient for purposes of Rule 29.

The INA and its regulations are precise regarding the duration of such a proceeding. A removal "proceeding" is governed by 8 U.S.C. § 1229a. It is commenced by the filing of a Notice

escape). There is no such bar in 18 U.S.C. § 751(a).

to Appear with the Immigration Court. 8 C.F.R. §§ 1003.14(a); 1239.1(a); *see also, e.g., Ajlani v. Chertoff,* 545 F.3d 229, 232 (2d Cir. 2008). It ends when the removal order becomes administratively final, which is (as relevant here) the date the administrative appeal of that order to the Board of Immigration Appeals is waived. 8 C.F.R. §§ 1240.14; 1003.29 (in pertinent part, "the decision of the Immigration Judge becomes final upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken whichever occurs first.").

Consistent with these provisions, a motion to re-open the removal proceeding must be filed (with some exceptions) within 90 days of "the date of entry of a final administrative order of removal." 8 U.S.C. § 1229a(c)(7)(C)(i). A motion to re-*open* obviously presupposes a proceeding that is *closed*, and the date the clock starts running is the closure date. Just as telling, federal court review of such a proceeding is only possible when a petition for review is filed within 30 days "after the date of the final order of removal," 8 U.S.C. § 1252(b)(1); *see also id.* § 1252(a)(5) (exclusive means of review). More importantly, this provision governing judicial review also makes clear at several junctures that agency "proceedings" resulting in a reviewable, administratively final order are a separate phase from actions to carry out such an order. Hence, subsection (b)(9), purporting to close more permissive doors to federal courts available pre-IIRIRA, provides in part: "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any *action taken or proceeding brought* to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9) (emphasis added). Subsection (g) provides that "[e]xcept as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including **section 2241 of title 28**, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to *commence proceedings*, adjudicate cases, *or execute removal orders* against any alien under this chapter." 8 U.S.C. § 1252(g) (emphasis added).[9]

Under this scheme, the custody of the noncitizen "for" *immigration proceedings* within the meaning of 18 U.S.C. § 751(a) must be a different thing than custody "for" effectuation of the administratively final order that *ended* the proceeding. The former (arrest and detention prior to and pending removal proceedings) is provided for by 8 U.S.C. § 1226(a) , which reads that "[o]n a warrant issued by the **Attorney General**, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."); *see id.* § 1226(c) (providing for mandatory detention in some cases); 8 C.F.R. § 1003.19 (governing immigration court review of

---

[9] Courts have taken these court-stripping provisions at far less than face value. *See generally Zadvydas v. Davis,* 533 U.S. 678, 687-88 (2001) (concluding that IRRIRA did not eliminate habeas review of post-final-order detention for lawfulness); *INS v. St. Cyr,* 533 U.S. 289 (2001) (wighing effect of sec. 1252(a)(9)'s putative jurisdiction stripping of habeas review). For purposes of this Motion, the point is simply that in attempting to channel all or nearly all federal judicial review into § 1252's narrow funnel, Congress saw the need to describe injunctions and relief relating to "proceedings" separately from "action[s] taken" to effectuate removal or "execut[ion] of removal orders," *id.* §§ 1252(b)(9);(g). This is consistent with the other statutes and regulations described above and the detention provisions discussed *infra.*

custody status).[10]  Not applicable here is a separate source of custody for noncitizens stopped at a port-of-entry for failure to establish entitlement to lawful admission (known as "arriving aliens," 8 C.F.R. § 1001.1(q)); 8 U.S.C. § 1225(b)(2)(A) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.").

By contrast, an administratively final order of removal triggers an entirely separate (and elaborate) set of custody provisions under 8 U.S.C. § 1231 and associated regulations.  *Cf. e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 697 (2001) (considering constitutional challenge to post-final-order detention under § 1231, distinguishing "detention pending a determination of removability" as presenting different issues) *with Demore v. Kim*, 538 U.S. 510, 528-29 (2003) (considering constitutional challenge to detention during proceedings under § 1226; distinguishing *Zadvydas* explicitly on that basis).

The final order triggers the beginning of a 90-day "removal period."  8 U.S.C. § 1231(a)(1)(A),(B).  The Government is required to effectuate removal during this period if at all possible, and detention during this period is authorized, and in some cases required, by § 1231(a)(2).  Section 1231(a)(3), in turn, provides:

> If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General. The regulations shall include provisions requiring the alien—
> (A) to appear before an immigration officer periodically for identification;
> (B) to submit, if necessary, to a medical and psychiatric examination at the expense of the United States Government;
> (C) to give information under oath about the alien's nationality, circumstances, habits, associations, and activities, and other information the Attorney General considers appropriate; and
> (D) to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien.

---

[10] That regulation provides, *inter alia*, that "[w]hile any proceeding is pending before the Executive Office for Immigration Review, the Service shall immediately advise the Immigration Court having administrative control over the Record of Proceeding of a change in the respondent/applicant's custody location or of release from Service.  8 C.F.R. § 1003.19(g).  That provision does not on its face specify when "proceedings" are or are not "pending," but the provisions discussed above do.  Notably, the role of the Executive Office for Immigration Review ("EOIR"), the formal body under which immigration judges and the BIA exercise the Attorney General's statutory authority to conduct removal proceedings under 8 U.S.C. § 1229a) ends upon the issuance of an administratively final order, as described above.  *See* 8 C.F.R. § 1003.0 (describing EOIR components and powers).  And 8 U.S.C. § 1252, discussed above, makes plain that federal courts *review* proceedings but that such review is not part of such proceedings.

Thus, in the ordinary case the statute provides for up to 90 days of detention following the date a removal order becomes final, and if removal has not been effectuated, requires release under supervision until it can be. One further provision is relevant, which is 8 U.S.C. § 1231(a)(6), specifying that a noncitizen "ordered removed who is . . . removable under section 237(a)(1)(C[or] 237(a)(2) . . . or who has been determined to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)." This provision applies to Mr. Mbacke, whose consulate refused to issue travel documents and who was found deportable under *both* § 237(a)(1)(C) and 237(a)(2) of the INA. *See* Gov't Ex. 3 (citing both sections as the basis for the order of removal).

Before 2001, the government asserted that 8 U.S.C. § 1231(a)(6) authorized *indefinite* detention of certain noncitizens, whether or not the government could actually effectuate removal. In *Zadvydas v. Davis*, 533 U.S. 678, 697 (2001) The Supreme Court rejected this interpretation of the detention provisions, holding on constitutional avoidance grounds that detention can be presumptively authorized for no more than six months past the date a removal order becomes final, subject to an exception if the government can show that removal in the reasonably foreseeable future is in fact significantly likely. *Zadvydas*, 533 U.S. at 701. The *Zadvydas* holding is reflected in the regulations at 8 C.F.R. Part 241, subpart A, mentioned above. These regulations set out a timeline and procedure for the government to review the custody (and foreseeability of removal) of a noncitizen subject to 8 U.S.C. § 1231(a)(6). Consistent with *Zadvydas*, detention may only be continued if requisite findings of foreseeable removal or other specified circumstances exist. *See generally* 8 C.F.R. § 241.4.

Turning back to the phrase in section 751(a)'s referring to "custody . . . pursuant to lawful arrest . . . *for* exclusion or expulsion proceedings," 18 U.S.C. § 751(a) (emphasis added), these words can only sensibly be understood to refer to section 1226 custody "pending a decision on whether the alien is to be removed from the United States," or custody of "arriving aliens" under section 1225(b) "for a proceeding under section 1229a of this title." It cannot extend to the post-final-order removal period, which is governed by section 1231 relating to what happens *after* proceedings.

As the Court noted during the arguments on Mr. Mbacke's Rule 29 motion, this reading best accords with the structure of § 751(a) as a whole, since the other circumstance that creates a *misdemeanor* violation similarly relates to *preconviction* arrest custody. The Court's view is consistent with the well-settled rule of statutory interpretation that statutes should be read as a whole to make sense of legislative intent. *E.g., Loginovskaya v. Batratchenko*, 936 F. Supp. 2d 357, 369 (S.D.N.Y. 2013) (citing *Mosle v. Bidwell*, 130 F. 334, 335 (2d Cir.1904) ("In doubtful cases a court should compare all parts of a statute and different statutes in pari materia to ascertain the intent of the Legislature."); *Ingenito v. Bermec Corp.,* 376 F.Supp. 1154, 1177 (S.D.N.Y.1974) (reciting the "familiar canon of statutory construction that parts of a statute are to be read

together, in pari materia"), *aff'd*, 764 F.3d 266 (2d Cir. 2014).

This brings us back once again to the Eleventh Circuit's *Rodriguez-Fernandez* decision, 234 F.3d at 500-01, which on this point comes closer to relevance: a bunt that rolled foul. In *Rodriguez*, the trial court had rejected the defense contention that the "removal period" had expired by the time of the defendant's escape. *Id.* at 499-500. As described, this argument incorrectly assumed or conceded that the 90-day removal period is itself part of "exclusion proceedings" under the modern INA, but at least adverted to the fact that detention *thereafter* is not. *See id.* The Eleventh Circuit putatively found it unnecessary to reach the issue of whether the removal period was over, *id.*at 499 n.2, based on its holding that "[n]either the Order of Removal nor the Notice to Appear stated that Rodriguez-Fernandez should be detained." *Id.* at 500. Given the record on appeal, the Eleventh Circuit treated the issue purely as one of a lack of paper evidence of detention authority before the jury and the insufficiency of the INS officer's testimony. *Id.* at 500-501. What was not discussed is the reason that those documents do not order detention post-removal order, which is a purely legal matter: they are intended to begin and end a removal "proceeding," as set forth above. The paperwork expected for later stage (post-removal order) detention, which is under 8 U.S.C. § 1231, arises initially from a "removal warrant" (I-205), 8 C.F.R. § 241.3(a).[11] After 90 days it arises from the required reviews under 8 C.F.R. § 241.4 and/or revocation of release under those procedures, *see id.* § 241.4(*l*) (discussed *infra*).

That review, under 8 C.F.R 241.4, was precisely what Mr. Mbacke got, as can be seen from the "HQ POCR Checklist" in the HQ Release Notification, Def. Ex. G. Mr. Mbacke's detention had last long enough to kick in the protections of 8 C.F.R. 241.4, transferring jurisdiction of his detention to HQ POCR, the Post Order Review Unit of ICE in Washington D.C., as described in Def. Ex. I.

Thus, the *Rodriguez-Fernandez* court's holding rests implicitly on the argument advanced here, that custody "for . . . proceedings" as used in 18 U.S.C. § 751(a) does not include the custody that follows a final order, and supports Mr. Mbacke's motion for a Judgment of Acquittal.

c. "**Pursuant to Arrest**" **Language**

Another argument must be addressed. That is whether there was sufficient evidence to convince a rational juror that Mr. Mbacke was in such custody "pursuant to arrest" at the time of the alleged escape.

As the Court noted at the charging conference, the INA defines the "arrest" powers of its agents at § 287(a)(2), 8 U.S.C. § 1357(a)(2), to consist of the power

> to arrest any alien who in his presence or view is entering or attempting to
> enter the United States in violation of any law or regulation made in

---

[11] 8 C.F.R. § 241.3(a) ("Once the removal period defined in section 241(a)(1) of the Act [8U.S.C. § 1231(a)(1)] begins, an alien in the United States will be taken into custody pursuant to the warrant of removal.")

pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, *but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.*

*Id.* (emphasis added).[12]  The italicized language demonstrates that this "arrest" power relates to the need to secure a noncitizen so that the agency can, in the first instance, decide whether or not the alleged civil violation requires ejection from the country.  Once again, read in pari material with the other misdemeanor prong of § 751(a), escape from "arrest or charge of or for a misdemeanor, and prior to conviction," id. (emphasis added), the statute is logically tiered to prescribe lesser punishment for pre-adjudication "escape."  Subsections (4) and (5) further bestow "arrest" powers for other specified criminal law violations and the Government does not argue that Mr. Mbacke was in such custody at the relevant time.  *Accord* 8 C.F.R. § 287.5(c)(1)-(5) (assigning these statutory arrest powers to particular job titles under legacy INS, though they no longer correspond exactly to current DHS classifications).  Also relevant is 8 U.S.C. sec. 1226(a), which as discussed above governs custody during removal proceedings.  *See id.* ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." (emphasis added)).

_____

[12]  This statute was another instance of an IIRIRA conforming amendment adding "or removal" to "the admission, exclusion, [or] expulsion of aliens" as it read pre-IIRIRA – the change was wrought by another subparagraph of IIRIRA § 308(d)(4), the same provision that made the equivalent change to the definition of "immigration laws," and that added the term "removal" elsewhere in the INA where called for.  *See* IIRIRA § 308(d)(4)(L)(i), 110 Stat. 3009 (providing that "[s]ection 287 (8 U.S.C. 1357) is amended . . . in subsection (a), by striking 'or expulsion' each place it appears and inserting 'expulsion, or removal'").  The statutes in effect in 1948, when § 751(a) was enacted, similarly restricted "arrest" powers to not-yet-adjudicated civil violations of "law[s] regulating the admission, exclusion, or expulsion of aliens," Act of Feb. 27, 1925, ch. 364 Tit. IV, unnumbered proviso, Pub. L. No. 502, 43 Stat. 1014, 1049.  And the precursor provision to the modern re-entry statute referred to briefly above, section 3 of the 1918 Act, provided that "any alien who shall, after he has been excluded and deported or arrested and deported in pursuance of the provisions of this Act, thereafter return to or enter the United States or attempt to return to or to enter the United States shall be deemed guilty of a felony, and upon conviction thereof shall be punished by imprisonment for a term of not more than five years: and shall, upon the termination of such imprisonment, be taken into custody, upon the warrant of the Secretary of Labor, and deported in the manner provided in the immigration Act of February fifth, nineteen hundred and seventeen."  Under this scheme, arrest *preceded* an initial deportation and the re-instatement of that order called for being "taken into custody" on a warrant of deportation, not arrest.  These predecessor provisions creating the same distinction between pre-adjudication arrest and post-order detention make the point above and *infra* equally salient, *mutatis mutandis,* if the Court concludes, as argued above, that IIRIRA's conforming amendments show "removal" is not "expulsion." But for purposes of the argument in the main text, which assumes *arguendo* removal is "expulsion," the current law necessarily controls.

Meanwhile, the power to assume custody of a noncitizen after a civil violation of immigration law has been adjudicated is defined separately. The post-final-order custody provisions discussed at length above do not provide for "arrest" of subject noncitizens but only detention. *See* 8 U.S.C. § 1231 ("Detention and removal of aliens ordered removed"); 8 C.F.R. 241.4(a) ("Scope" of regulation is "authority to continue an alien in custody or grant release"). The power to assume custody of a noncitizen who is at liberty during the post-final-order period may be justified in the first instance by a warrant of removal, as discussed above, but again as the Court has observed, the power to execute such a warrant is defined separately by cross-reference to the officers empowered to effectuate an "arrest," confirming the execution of such a warrant is not the same thing as an "arrest." 8 C.F.R. § 287.2(b). And lastly, as the Court noted, an authoritative immigration law treatise similarly distinguishes "arrest" as a power of immigration agents relating to pre-adjudication seizures of the person from "detention" after proceedings conclude. Kurbzan's Imm. Law Sourcebook, ch. 3.X.K,L, at 423-26 (15th ed. 2015).

For these reasons, no rational juror could conclude that the trial evidence showed lawful ccustody "pursuant to . . . arrest" under 18 U.S.C. § 751(a) even to the extent the Government relied on the removal warrant or revocation notice (and even assuming, arguendo, the latter was "lawful," which it was not). This, too, alone justifies the grant of this Motion.

### c. Removal Order and Notice to Appear Did Not and Could Not Prove Lawful Custody

In addition to the argument concerning § 751(a)'s meaning, the same evidentiary argument obtains here as it did in *Rodriguez-Fernandez*. In its opening statement to the jury, the Government argued that legal custody in this case was taken pursuant to the immigration judge's order of removal (Gov't Ex. 2). *See* Tr. 19:8-10 (arguing to jury that "order signed by a federal judge directing that the defendant be removed" was reason for his custody on March 27, 2018); Tr. 20:24–21:1 (arguing to jury that "the federal judge's order ordering him removed" was evidence that would establish the government's case). At closing it primarily argued the same, referring to other documents only in response to defense arguments. Tr. 553:6-7 ("You've heard and seen overwhelming evidence that the defendant was ordered removed by [a] United States Immigration Judge"); 553:21-22 (defendant "was in the custody of a U.S. deportation officer because of an Immigration Judge's order of removal"); 554:2-4 ("[T]here is no dispute that the Immigration Judge ordered the defendant removed to Senegal in 2015").

As we noted before the trial began, ECF Dkt. 32,[13] to the extent the Government relies on this evidence to make its case, it failed to satisfy the element of § 751(a) that the Defendant be in lawful custody.[14] The removal order was arguably a *necessary* predicate to legal custody in March of 2018, in the somewhat trivial sense that a lawful removal order is required for a noncitizen to be removed, but having been held for the 90-day removal period and a further period permitted under 8 U.S.C. § 1231(a)(6) and C.F.R. 241.4, and then released, it was not *sufficient*. Here as in *Rodriguez-Fernandez* neither the Notice to Appear nor the removal order authorizes (or could authorize) custody as charged in the Information, i.e. on or about March 27, 2018, after the administratively final order the jury had in evidence.

### d.  Once the Custody Determination was Transferred to  ICE HQ,  the Field Office Was Divested of Jurisdiction to Revoke Mr. Mbacke's Custody

The evidence at trial is uncontradicted that Mr. Mbacke was released from ICE detention on June 15, 2016 pursuant to the 8 C.F.R. § 241.4 procedures by decision dated June 15, 2016. Def. Ex. G (release notification dated June 15, 2016).  The timing of the reviews, and the places they were conducted, track the periods specified in 8 C.F.R. § 241.4.  Def. Ex. I (describing the jurisdictional transfer process to ICE's Headquarters Post Order Custody Review Unit); *see also* 8 C.F.R. §§ 241.4(h)(1) (local custody review prior to the expiration of the 90-day removal period); 241.1(k)(1) (same); 241.1(k)(ii) (providing for transfer of subsequent reviews to HQPDU "if he of she is not removed within the thee-month period following the expiration of the removal period"); 241.4(k)(ii) (mandating such transfer if release is not granted 180 days following removal; providing for further HQ review at "the expiration of the three-month period after the 90-day review or as soon as practicable thereafter").

Once release is granted under 241.4, its revocation is controlled by 241.4(*l*).  Although the jury had before it the January 26, 2018 revocation notice, Gov't Ex 5, no reasonable juror could conclude it sufficed to show *lawful* custody as a matter of law, for three independently sufficient reasons: (1) it was not issued by an empowered official, (2) it stated a facially invalid basis; and (3) it failed to adhere to the requirement that he be allowed to rebut his alleged failure to comply with the terms of his release.  None of these is a technicality.  It is the essence of lawful authority that the decision maker be authorized by statute.

---

[13] In response to the Government's request to Charge, the Defense submitted ECF Dkt. 32, making a record on the Government's theory raising a claim of facial insufficiency to the Information: "We also hear the Government to be taking a view of the charge that gives rise to a Motion to Dismiss the Information pursuant to Fed. R. Crim. P. 12(b)(3)(B), based upon a defect in th Iindictment or Information for failure to state an offense. While it was previously assumed that the operative document for purposes of custody was an ICE-issued 2018 Revocation of Release Order that the Government, in its Reply to Response, ECF 30, states their position is that Mr. Mbacke being removed "pursuant to a United States Immigration Judge's final order of removal." ECF 30, at 1.

[14] Mr. Mbacke continues to object to the court's charge on this element for the reasons given on the record.  Trial T. July 22, 2018, at 547:6, 548:13-21.

The Second Circuit has not hesitated to enforce the finer points of the law when it comes to arrest authority. For example, in *United States v. Janvier*, 599 F.3d 264 (2d Cir. 2010), the Second Circuit found that the district court lacked jurisdiction to entertain a violation of supervised release where the statute required that the violation warrant be not just signed by the district judge, but *filed* with the clerk of the court. In *Janvier*, the government had argued that the statute authorizing the arrest, 18 U.S.C. § 3583(i), was materially followed in that the Probation Officer had obtained an arrest warrant for a supervised releasee's custody from a district judge, and that the statute's requirement that the warrant be docketed with the Court Clerk (and thus "issued" within the meaning of the statute) prior to arrest was unnecessary. The Court rejected this argument:

> From a policy standpoint, it might well make more sense to trigger the retention of jurisdiction by the action of a judicial officer determining that probable cause exists and directing that a warrant issue, rather than by the purely ministerial action of the clerk of the court in actually issuing the warrant, which follows inevitably from the court's action. But to adopt the government's argument would be to rewrite the statute to say something that it does not say because we or the government think the revised version would be preferable. The language of the statute, and of the district court's action here, is simply inconsistent with this approach.

*United States v. Janvier*, 599 F.3d at 268. Because the statute authorizing arrest had not been fully followed within the supervisory period, the Second Circuit held that the district court was divested of jurisdiction over the violation proceeding.

Likewise, in Mr. Mbacke's case, once the 8 C.F.R. 241.4 HQ review was put in place in 2016, Def. Ex. G, the Detroit Field Office Director was divested of jurisdiction to revoke release. As noted above, 8 C.F.R. Part 241, Subpart A governed his release from ICE custody after the 90-day "removal period," and once his release was approved by an ICE Headquarters official, the Chief of the Removal and International Operations unit, pursuant to 8 C.F.R. § 241.4(k)(1)(ii) and (k)(2), the matter was out of the Field Director's hands.[1] Thus, authority to revoke Mr. Mbacke's release had passed to ICE Headquarters in Washington, 8 C.F.R. Section 241.4(*l*), which explicitly

---

[1] 8 C.F.R. § 241.4(l) provides that the "Executive Associate Commissioner shall have authority, in the exercise of discretion, to revoke release . . . . A district director may also revoke release of an alien when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner. Release may be revoked in the exercise of discretion when, in the opinion of the revoking official: (i) The purposes of release have been served; (ii) The alien violates any condition of release; (iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or (iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.)

divests the local offices of jurisdiction over the alien's detention absent exigent circumstances of which no evidence exists in this record.[3]

8 C.F.R. § 241.4(c)(2) further clarifies that what goes to HQ stays with HQ: "For any alien the district director refers for further review after the removal period, or any alien who has not been released or removed by the expiration of the three-month period after the review, all further custody determinations will be made by the Executive Associate Commissioner, acting through the HQPDU." Even viewing the evidence in the light most favorable to the Government, as we must, and even assuming that Field Office Director R. Adducci, whom the Government did not call as a witness, somehow authorized Deportation Officer "MSM" to sign it for her, the document is a legal nullity at best.

In short, Gov't Ex. 5, the purported basis for the Defendant's March 27, 2018 custody, was issued by the wrong authority, whose rubber stamped signature was initialed by a law enforcement officer with no authority, which was never properly served on or acknowledged by the person whose freedom it purported to limit.

To place this evidence in context, suppose that a criminal defendant in this Courthouse were to be presented at a Rule 5 initial appearance, with an Arrest Warrant bearing the rubber-stamp signature of a Magistrate Judge that is initialed–with no explanation–by the police officer who effected the defendant's arrest. We daresay that the Magistrate Judges in this Courthouse would make short work of that case.

Based on this record, no reasonable juror could conclude that Gov't Ex. 5 provided lawful authority for Mr. Mbacke's detention.

### e. Unsupported Bases for Revocation and Failure to Follow Informal Interview Procedure

These points regarding the lawfulness of Gov't Ex. 5 are bolstered by the recent decision in *Rombot v. Souza,* 296 F.Supp.3d 383 (D. Mass. 2017). There, the court granted a habeas petition where ICE's post-final-order custody status review was improperly conducted in violation of 8 CFR § 241.4. As stated by the Court in *Rombot*:

> [I]f ICE intended to revoke Rombot's release, it was required to follow the procedures set out in 8 C.F.R. § 241.4. It did not. The Executive Associate Commissioner or the district director has the discretion to revoke an alien 'to

---

[3] This stands in marked contrast to the regulation's treatment of *withdrawal* of a release approval before the noncitizen has actually been released. 8 C.F.R. § 241.4(j)(4) allows *either* the local office or HQ to withdraw their *own* approval prior to actual release, in their discretion. But 241.4(*l*) only permits a district director to *revoke* release when HQ cannot reasonably do so under the circumstances, *no matter who* originally approved the release.

enforce a removal order.' 8 C.F.R. § 241.4(*l*)(2). The reason given for Rombot's revocation—'a significant likelihood of removal in the foreseeable future'—shows that ICE intended to enforce his removal order. However, the record demonstrates the revocation decision was made by Field Office Director Cronen. . . When it reviewed Rombot's custody status prematurely on October 24, 2017, ICE violated its own regulations and procedures, see 8 C.F.R. § 241.4, depriving Rombot of his right to a meaningful custody status review.

*Rombot* further discusses ICE's failure to support revocation allegations. In Mr. Mbacke's case, the 2018 Revocation of Release is a nullity for the simple reason that it gives a facially spurious basis for revocation ("failure to provide Senegal travel document"), and the Government's failure to offer evidence that Mr. Mbacke was provided the opportunity to contest that basis at an informal hearing. Indeed the evidence at trial points to the opposite conclusion – that the circumstances of Mr. Mbacke's obtaining travel documents had not changed between the 2016 Release Order and the 2018 Revocation of Release. Def. Ex. G (reciting Mr. Mbacke interviewed by embassy and Senegalese consulates refusal to issue travel documents); Gov't Ex. 3 (showing that Senegalese duplicate birth certificate was mailed to him and provided to ICE such that it became part of the A-File). The Second Circuit has observed that "[w]hile the Immigration Court can and must expect respondents who are ordered to appear before it to make every responsible effort to comply with the order, it cannot expect the impossible," and it acts capriciously and arbitrarily when it does so. *Twum v. I.N.S.*, 411 F.3d 54, 61 (2d Cir. 2005). Similarly, the *Rombot* court found no evidentiary support for ICE official's decision to continue detention by labeling Rombot a "a safety risk to the community" based on his "review of the facts in [Rombot's] case, including alleged "criminal arrests for obstructing a court order and failure to appear." Unsupported by the record, that "decision is evidence of ICE's utter disregard for the agency's own procedures."). *Rombot*, 296 F. Supp. 3d at 388.

In Mr. Mbacke's case the Government also failed to prove that even if the Revocation Order, Gov't Ex. 5, was jurisdictionally sound, that ICE complied with the informal hearing procedure outlined in 8 CFR 241.1(l)(1). That section dictates that upon revocation of release, the alien "will be afforded an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." When the government fails to comply with its own federal regulations the action should be found invalid. *See, e.g. Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 403-04 (SDNY 2004) (granting habeas petition where petitioner was deported fewer than 72 hours after her arrest and regulation mandated a 72 hour rule); *cf. Ragbir v. Sessions*, 18 Civ. 236 (KBF) (SDNY) (mem., at ECF dkt # 48) (releasing alien on habeas petition filed after alien, who was on release supervision pending removal, was taken into ICE custody on a peremptorily-issued revocation of release).

The Government offered no evidence that anyone provided Mr. Mbacke with his right o informal interview to contest the stated basis for his revocation at any time from January 26, 2018

to the relevant time in the Information, on or about March 27 of 2018. To the contrary, the custodian of the A-file testified that he was unaware that one had been provided. Tr. 424:2-11.

### f. Legal Right to Resist Unlawful Arrest

Had Mr. Mbacke been provided with the opportunity to contest the lawfulness of his detention he might not have had to resort to walking away. On this point, it bears noting that the law continues to recognize the historical right to resist an unlawful arrest, as set forth in *United States v. DiRe,* 221 US 581, 594 (1948) (citing *John Bad Elk,* 177 U.S. 529 (1900); *United States v. Heliczer,* 373 F.2d 241, 244 n. 3 (2d Cir. 1967) (*DiRe* and *John Bad Elk* do "not appear to have been overruled"); *see also United States v. McCarthy,* 249 F.Supp. 199, 201 (E.D.N.Y. 1966) ("A person in custody under lawful arrest is required to submit to the arresting authority, while one under unlawful arrest may resist."). Surely if one has the right to use reasonable force to resist arrest, then it follows that one has the right to absent oneself peaceably from that unlawful custody as well.

## D. New Trial Required in the Interest of Justice

If the Court does not agree that the Rule 29(a) directed a Judgment of Acquittal at the end of the Government's case, we respectfully request the opportunity to argue that the Court should vacate the verdict and grant a new trial in the interests of justice pursuant to Rule 33. Rule 29 contemplates a ruling on the Rule 33 motion even if the Court does grant the Rule 29 motion.

In addition to the arguments made in support of the Rule 29 motion, in connection with Rule 33, the Court could reconsider the fairness of certain rulings. The denial of the Defendant the right to cross examine the deportation agents regarding an OIG investigation into their conduct in this very case, coupled with the Court erroneous instruction to the jury regarding the meaning of "expulsion," impeded the Defendant's right to fair trial. By preventing the jury from hearing about the OIG investigation, jurors were left with the mistaken impression that these deportation officers did nothing wrong. The erroneous instruction to the jury on "expulsion" essentially charged the defense out of the case.

Here, as indicated in Court at the charging conference, the Defendant intended to sum up before the Jury on the absence of evidence of pre-1997 proceedings, and as affirmatively proved with Gov't Exhibit 16, checking the box indicating that these were post-1997 removal proceedings.

Once the Court decided to issue the erroneous jury instruction on "expulsion," counsel was forced to revamp the closing argument, as it was effectively neutralized by the Court instruction to the jury that expulsion and deportation were essentially synonymous, Tr. 605.

The defendant was also unjustly prejudiced by the Court's ruling denying inquiry into the OIG investigation of the three deportation officers. This placed the defense in a challenging

strategic decision prior to the charging conference about whether to offer in its case the audio of the April 3, 2018 OIG interview at MCC Chicago. The interview, which is included here on CD-Rom(Bates 298) for the Court's review, was clearly an investigation by OIG into the conduct of the three deportation officers from the airport investigation, an event deemed so important that the OIG agents proceeded with the interview in plain violation of the Defendant's Sixth Amendment Right to Counsel. However, based on the Court's ruling excluding inquiry into the OIG investigation, Tr. 51, the interview's context could be misunderstood and the defense decided against offering it.

On factual custody, Mr. Mbacke's defense relied on the claim that the deportation agents did not exercise control over him such that he was justified in feeling free to leave. Without the OIG investigation, the defense was unfairly prejudiced in his ability to call the agents' credibility into question.

On legal custody, Mr. Mbacke's defense relied upon the simple proposition that there was no proof of exclusion under the immigration laws. The Court's charge eliminated that defense.

If the Court declines to issue the Rule 29 Judgment of Acquittal, Mr. Mbacke is entitled to a new trial on these bases. *See, e.g., United States v. Scully*, 877 F.3d 464 (2017) (district court's exclusion of evidence coupled with tainted jury instruction deprived him of a fair trial).

## E. Motion to Dismiss Information under 18 U.S.C. 751(a) as vague as-applied to this Defendant.

Should the Court disagree with respect to the Rule 29 bases described above, we respectfully request that the Court consider whether the Information should be dismissed on the basis of the constitutional vagueness of 18 U.S.C. § 751(a), as applied to Mr. Mbacke. The Court need not reach the Constitutional challenge if it can rule in the Defendant's favor on other grounds. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)

### 1. Procedure Context of As-Applied Vagueness Challenge

An "as applied" vagueness challenge is properly brought under Rule 29 or Rule 33, as it arises only in the context of a fully developed record. Thus, in *United States v. Bastain*, 112 F.Supp.2d 378, 380 (SDNY 2000) (defendant's vagueness challenge to 18 U.S.C. § 922(g)(3) could not be raised in a pre-trial motion to dismiss); *United States v. Reed*, 114 F.3d 1067, 1070 (10th Cir.1997) (district court impermissibly determined the constitutionality of § 922(g)(3) on a pre-trial motion to dismiss before the government had presented any evidence concerning the defendant's conduct). "Such a sensitive and fact intensive analysis ... should be based only on the facts as they emerge at trial . . . A proffer is not evidence, ipso facto." *Bastain*, 112 F.Supp..2d at 380 (citing *Reed).*

### 2. Substance of As Applied Vagueness Challenge

The Supreme Court has told us (repeatedly) that the relevant question in void for vagueness challenges is merely whether the defendant before us 'had fair notice from the language' of the law 'that the particular conduct which he engaged in was punishable.' " *United States v. Baldwin*, 745 F.3d 1027, 1031–32 (10th Cir.2014) (*quoting Parker v. Levy*, 417 U.S. 733, 755, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974)).

Two underlying principles animate vagueness concerns: notice and improper delegation. The trial in this case bore out how both of these concerns were triggered here by the application of 18 U.S.C. 751(a) to the events of March 27, 2018. As applied here, 18 U.S.C. § 751(a) does not provide notice that it would apply to Mr. Mbacke's removal. Laws are "not to be avoided by the simple label a state chooses to fasten upon its conduct or its statute after the fact." *Gaccio v. Pennsylvania*, 382 US 399, 402 (1966) (cited in Justice Gorsuch's concurring opinion in *Sessions v. Dimaya*). The record developed at Mr. Mbacke's trial demonstrates how immigration agents possess random and unpredictable authority to assert custody, guided (or not guided) by random and unpredictable authorities who could authorize release and a pitiful lack of policy guidance.

This remedy of dismissal or acquittal sought here flows naturally from the United States Supreme Courts recent decision in *Sessions v. Dimaya*, 138 U.S. 1204 (2018). There the Court discussed the progression of vagueness challenge in a "crimigation" context, that is where the criminal and immigration laws intersect. Here is what the *Dimaya* Court described the precedent in this area:

> The prohibition of vagueness in criminal statutes," our decision in Johnson explained, is an "essential" of due process, required by both "ordinary notions of fair play and the settled rules of law." 576 U.S., at ----, 135 S.Ct., at 2557 (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). The void-for-vagueness doctrine, as we have called it, guarantees that ordinary people have "fair notice" of the conduct a statute proscribes. *Papachristou v. Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). And the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges. *See Kolender v. Lawson*, 461 U.S. 352, 357–358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). In that sense, the doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not. *Cf. id.*, at 358, n. 7, 103 S.Ct. 1855 ("[I]f the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, [it would] substitute the judicial for the legislative department" (internal quotation marks omitted)).78 The Government argues that a less searching form of the void-for-vagueness doctrine applies here than in Johnson because this is not a criminal case. *See Brief for Petitioner* 13–15.

Discussing when the vagueness of a law defies Due Process, the Court squarely rejected the Government argument that the "degree of vagueness that the Constitution [allows] . . . varies with the consequences of imprecision," and asked the Court to find that even a law too vague to support a conviction or sentence may be good enough to sustain a deportation order." *Dimaya*, at ___ (citing *Brief for Petitioner* 25–26.). To the contrary, wrote the *Dimaya* Court,

> "[Our] precedent forecloses that argument, because we long ago held that the most exacting vagueness standard should apply in removal cases. In Jordan v. De George, we considered whether a provision of immigration law making an alien deportable if convicted of a "crime involving moral turpitude" was "sufficiently definite." 341 U.S. 223, 229, 71 S.Ct. 703, 95 L.Ed. 886 (1951). That provision, we noted, "is not a criminal statute" (as § 16(b) actually is). Id., at 231, 71 S.Ct. 703; supra, at 1210 – 1211. Still, we chose to test (and ultimately uphold) it "under the established criteria of the 'void for vagueness' doctrine" applicable to criminal laws. 341 U.S., at 231, 71 S.Ct. 703. That approach was demanded, we explained, "in view of the grave nature of deportation," ibid.—a "drastic measure," often amounting to lifelong "banishment or exile," ibid. (quoting Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948)). Nothing in the ensuing years calls that reasoning into question. To the contrary, this Court has reiterated that deportation is "a particularly severe penalty," which may be of greater concern to a convicted alien than "any potential jail sentence." Jae Lee v. United States, 582 U.S. ––––, ––––, 137 S.Ct. 1958, 1968, 198 L.Ed.2d 476 (2017) (quoting Padilla v. Kentucky, 559 U.S. 356, 365, 368, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010)). And we have observed that as federal immigration law increasingly hinged deportation orders on prior convictions, removal proceedings became ever more "intimately related to the criminal process." Chaidez v. United States, 568 U.S. 342, 352, 133 S.Ct. 1103, 185 L.Ed.2d 149 (2013) (quoting Padilla, 559 U.S., at 365, 130 S.Ct. 1473). What follows, as Jordan recognized, is the use of the same standard in the two settings. For that reason, the Government cannot take refuge in a more permissive form of the void-for-vagueness doctrine than the one Johnson employed. To salvage § 16's residual clause, even for use in immigration hearings, the Government must instead persuade us that it is materially clearer than its now-invalidated ACCA counterpart. That is the issue we next address, as guided by Johnson 's analysis.

*Sessions v. Dimaya,* 138 S. Ct. 1204, 1212–13 (2018)

If the residual clause of 18 U.S.C. § 924c and ACCA and 8 U.S.C. § 16(b) are all vague per *Dimaya, Johnson,* and their progeny, context, so too here, the crime of escape under 18 U.S.C. 751(a) is vague in that is it fails to give fair notice and improperly delegates discretion to make law to law enforcement. In other words, if the

term "crime of violence" in both the immigration and criminal context is unclear, what are we to make of "exclusion or expulsion"?

Thank You, as always, for Your continued attention to this matter.

Respectfully Submitted,
/s/
Jan A. Rostal, Esq.
Isaac Wheeler, Esq.
Federal Defenders of N.Y.

enc. (By hand delivery)
cc:      AUSA Jonathan Algor, Esq.
         Mr. M. Mbacke (MDC)